Jeffrey S. Gluck (SBN 304555)
jeff@gluckip.com
**GLUCK LAW FIRM**
16950 Via De Santa Fe
Rancho Santa Fe, California 92067
Telephone: (310) 776-7413

Scott Alan Burroughs (SBN 235718)
scott@donigerlawfirm.com
Andres Navarro (SBN 358499)
anavarro@donigerlawfirm.com
**DONIGER / BURROUGHS**
603 Rose Avenue
Venice, California 90291
Telephone: (310) 590-1820
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAS DRAWLS, LLC, a Georgia Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>WHALECO, INC., a Delaware Corporation, individually, and doing business as "Temu"; PDD HOLDINGS, INC., a Delaware Corporation; and DOES 1-10,<br><br>Defendants. | Case No. 2:25-cv-07425-SB-BFM<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1. Common Law Trademark Infringement;<br>2. Violation of 15 U.S.C.A. § 1114;<br>3. Unfair Competition under Section 43(a) of The Lanham Act, False Endorsement (15 U.S.C. §1125(a));<br>4. Unfair Competition under California Business and Professions Code §§ 17200, et seq.;<br>5. Unfair Competition under California Common law; and<br>6. Contributory Trademark Infringement and Counterfeiting<br>7. Inducing Trademark Infringement and Counterfeiting<br>8. Vicarious Trademark Infringement |

and Counterfeiting

**JURY TRIAL DEMANDED**

Plaintiff, by and through its undersigned attorneys, hereby prays to this honorable court for relief based on the following:

## INTRODUCTION

Plaintiff GAS DRAWLS LLC ("Gas Drawls") brings this action against Whaleco Inc., individually and doing business as "Temu" (collectively, "Temu") to seek redress as set forth below.

Temu sold counterfeit and infringing goods to U.S. consumers through its proprietary sales application (or "app") and its website. Temu has been widely reported to be one of the most unethical companies operating today, employing strategic practices are believed to pose great threats to consumers, marketplaces, and the environment. On December 1, 2025, Senator Tom Cotton called for an investigation of the "Shein and Temu warehouses located in the United States. These Chinese communist retail platforms systematically engage in industrial-scale IP theft and counterfeiting against American designers, brands, and innovators."[1] Senator Cotton cites a recent study finding that "nearly half of the [Temu] items were likely counterfeits" and asserts that Temu is "engaged in industrial-scale IP theft and counterfeiting that is devastating American designers, brands, and innovators." Id. Plaintiff is one such party, as Temu's flood of cheap counterfeits has greatly undermined Plaintiff's ability to market its legitimate products.

On December 2, 2025, the Arizona Attorney General filed a complaint against Temu for using its site and app to steal and exfiltrate valuable and sensitive consumer data and personally-identifiable information ("PII"), and marketing products that

---

[1] https://www.cotton.senate.gov/news/press-releases/cotton-to-bondi-investigate-chinese-companies-shein-and-temu (last visited December 17, 2025 at 11:12 am EST)

"baldly infringe upon, or simply copy outright, intellectual property owned by U.S.-based businesses large and small." See **Exhibit 10**, ¶23.

And per a State of Nebraska complaint, Temu presents numerous discrete and dramatic risks. It has "flooded the United States with cheap products" and its "app operates as malware" that "unlawfully exfiltrate[s]" sensitive user data, which then "naturally flows to its powerful patron—the Chinese Communist Party."[2] Temu's "platform fuels a whole host of other harms. The examples are legion: the platform is awash in products infringing copyrights and other intellectual property, Temu engages in "greenwashing," and it has platformed sellers who use forced labor for the production of goods." *See id.*

A Select Committee further questioned Temu's treatment of its employees and found it virtually guaranteed that Temu has violated U.S. law by sending into the U.S. "products made with forced labor" on a "regular basis."[3] And the Arkansas Attorney General has also sued Temu, asserting that it is "a data-theft business" masquerading as an online store, run by "a cadre of former Chinese Communist Party officials" that are looking to improperly install malware and spyware on the devices of U.S. citizens.[4] A recent lawsuit also alleges that Temu's *entire operation is a scam*, with Temu losing "30-50 percent on every U.S. order placed."[5] If all of this wasn't bad enough, Temu's products tend to be toxic, with one recently found to include deadly

---

[2] *See* https://ago.nebraska.gov/sites/default/files/doc/2025.06.06%20%20-%20Temu%20Complaint%20%28Final%20-%20File%20Stamped%29.pdf (last visited June 16, 2025 at 3:23 pm EST)

[3] https://selectcommitteeontheccp.house.gov/sites/evo-subsites/selectcommitteeontheccp.house.gov/files/evo-media-document/fast-fashion-and-the-uyghur-genocide-interim-findings.pdf

[4] https://arkansasag.gov/news_releases/attorney-general-griffin-sues-chinese-e-commerce-company-temu-for-deceiving-arkansans-illegally-accessing-their-personal-information/

[5] *Roadget Business Pte. Ltd. v. PDD Holdings, Inc.*, CV 1:24-cv-2402 (U.S.D.C. Dist. Columbia 2024)

lead in an amount "more than 11 times the permissible limit."[6] And Temu's approach to intellectual property laws is similarly offensive, with its business notable for its numerous "accusations of copyright infringement." [7] Temu is known to exercise ironclad control over what products are sold on its platform, how much they are sold for and how they are manufactured.[8] Meaning Temu essentially functions as "a vertically integrated manufacturer and retailer," making it even more "vulnerable to claims that it sells pirated products."[9]

Temu's pattern of flouting the law and attempting to exploit the hard work and creativity of others without consent is manifest in the claims at issue here. Temu manufactured, marketed, advertised, delivered, shipped, and/or sold a myriad of items that are counterfeit or include blatant copies of Plaintiff's artwork, products, trademarks, and intellectual property. Temu sold each item and profits from sales of such products, in disregard of artist and brand rights. And, should an artist or rightsholder seek to hold them to account, they falsely claim to be a passive third-party platform exempt from liability. Temu is liable for such misconduct.

## JURISDICTION AND VENUE

1.      This action arises under Section 39 of the Lanham Act (15 U.S.C. § 1121).

2.      This Court has federal question jurisdiction under 28 U.S.C. § 1331 and 1338 (a) and (b) and has supplemental jurisdiction over the related state claims pursuant to 28 U.S.C. § 1367.

---

[6] https://www.lemonde.fr/en/international/article/2024/08/14/shein-and-temu-products-found-to-contain-high-levels-of-toxic-chemicals_6715032_4.html

[7] https://www.uscc.gov/sites/default/files/2023-04/Issue_Brief-Shein_Temu_and_Chinese_E-Commerce.pdf

[8] https://www.theinformation.com/articles/temu-keeps-an-iron-grip-on-suppliers-exposing-itself-to-u-s-ban-threat; https://www.youtube.com/shorts/iQo20L76sKc

[9] *Id.*

3.    Venue in this judicial district is proper per 28 U.S.C. § 1391(c) and 1400(a) because the judicial district in one or more Defendants does business and which a substantial part of the acts and omissions giving rise to the claims occurred.

**PARTIES**

4.    Plaintiff, Gas Drawls, LLC ("GAS DRAWLS") is a Georgia limited liability company with a primary business address at 4290 Bells Ferry Road NW, #106-589, Kennesaw, Georgia, 30144.

5.    Plaintiff is informed and believes and thereon alleges that Defendants PDD Holdings, Inc. ("PDD") and Whaleco Inc. ("Temu"), are Delaware corporations that claim a principal place of business at 31 St. James Avenue, Boston, Massachusetts 02116. Temu owns and operates an app and an online retail store under the Temu brand at https://www.temu.com. Temu is registered to do business in the state of California with the California Secretary of State and does substantial business in the state and this District.

6.    Upon information and belief, Defendants Does 1 through 10, inclusive, are other parties not yet identified who have infringed Plaintiff's trademark, have contributed to the infringement of Plaintiff's trademark and violation of Plaintiff's rights of publicity, or have engaged in one or more of the wrongful practices alleged herein. The true names, whether corporate, individual, or otherwise, of Defendants 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues said Defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when same have been ascertained.

7.    Upon information and belief, Plaintiff is informed and believes and thereon alleges that at all times relevant hereto each of the Defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants and was at all times acting within the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged,

with full knowledge of all the facts and circumstances, including, but not limited to, full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby. Plaintiff further alleges on information and belief that PDD and/or Temu owns, directs, operates, and/or otherwise controls the parties that fabricated the items at issue in this case.

8.    Plaintiff alleges on information and belief that PDD, Temu, and their merchants do not function as separate and independent corporate entities. Defendant Temu is directly controlled by Defendant PDD and at all relevant times, Defendant PDD has controlled and directed the operations of Temu and the Temu merchants, and Temu and those merchants have reported to PDD; and PDD has made, and continues to make, key strategy decisions for Temu and the merchants; and Temu and PDD have significant overlap of owners and executive officers of each corporation.

## **GENERAL FACTUAL ALLEGATIONS**

9.    Daniel Dumile Thompson, better known by his stage name "MF DOOM," was an acclaimed rapper with numerous critically acclaimed albums. He was honored in memoriam at the Grammy Awards and was widely recognizable by the iconic mask he would don during performances before his death in 2020. Plaintiff GAS DRAWLS owns the rights to MF DOOM's music and intellectual property, including trademarks associated with MF DOOM and all rights in MF DOOM's name, voice, signature, photograph, and likeness. GAS DRAWLS owns registered trademarks for, inter alia, "MF DOOM" (*Ser Nos. 90980685 and 90687346)*, "MF DOOM" written in a graffiti style (*Ser Nos. 98415028 and 99082478)*, "DOOM" written in a stylized bubble design (*Ser Nos. 90980606 and 90699969)*, "GAS DRAWLS" *(Ser Nos. 90980628, 90746811, and 90981411)*, an illustrated depiction of the mask MF DOOM wore while performing (*Ser No. 90977406)*, and "DOOM" (*Ser Nos. 90980605 and 90699948)*. We will refer to Plaintiff's marks collectively as the "Subject Marks" herein. Certain of the Subject Marks are set forth in **Exhibit 3** and claims are made here as to all of Plaintiff's marks that have been exploited by

1  Defendants, and each of them.

2      10.    Plaintiff alleges on information and belief that Temu directly fabricated,

3  sourced, marketed, sold, exported, imported, transported, and distributed products

4  bearing marks that were counterfeit and confusingly similar to the Subject Marks.

5      11.    Temu's claimed merchants are virtually invisible to the Temu consumer,

6  as the entire transaction experience, including the type of product, pricing, listing

7  display, ordering process, logistics, delivery, and customer service is managed by

8  Temu. The buyer perceives Temu as the retailer and seller of the product, as reflected

9  by consumer response data showing that Temu, and not its vendor, is the perceived

10  party selling the items, as evidenced in the below screen captures, in which consumers

11  in online forums state that they ordered the infringing product "from Temu" and that

12  the product "comes from Temu" and that "Temu has" the infringing items:







12.    Temu represents to the public that it sells the items on its app and site, as can be seen below, where an online advertisement that Temu paid for states that "Temu has" the items offered for sale and no vendors are mentioned:



13.    Temu claims to be a "passive marketplace" but passivity will be found only for marketplaces that do not exert any control or involvement over goods at issue, including as to their manufacturing, quality control, marketing, selling, and delivery of goods to consumers.

14.    In reality, Temu actively procures, directs the manufacture, prices, markets, stocks, sells, ships, handles quality control, delivers, and imports the products on its site. Attached as **Exhibit 4** is a Temu notice identifying the products on its site as products that Temu "offers" and "stock[s]" and "prices." Attached as **Exhibit 5** is a vendor agreement that explicitly states that the vendor is to "promote Temu products."

15.    Temu's merchant list overlaps with that of Target Corp. ("Target"), a retailer that sells products to consumers and which does not claim to be a passive platform.[10] Temu and Target appear to share not only suppliers but shipping and

---

[10] https://corporate.target.com/sustainability-governance/responsible-supply-chains/traceability-transparency (last visited December 17, 2025 at 2:39 pm EST).

distribution hubs in the same area in a Chinese manufacturing district.

16.    Plaintiff alleges on information and belief that Temu's vendors, either at Temu's direction or of their own volition, create shell names that are generic or difficult to decipher to list on Temu's online store, as these vendors distribute the same or similar product to Target using their corporate names. This appears to be an attempt to disguise the clear wholesaler-retailer relationship between Temu and the merchants. Belieing the ruse, in both cases the wholesaler ships the goods to the retailer (Target and Temu) and that retailer sells the goods to the public.

17.    In a complaint filed by Temu in the Northern of District California, Temu conceded that it is heavily involved with the product it sells on its platform "including fulfillment, warehousing, logistics, customer services, post-sale support, returns, and refunds," in addition to "trust and safety services to curate sellers and control the quality of goods, risk control and data security services to protect consumers' personal and payment information." *Roadget Bus. Pte. Ltd. v. PDD Holdings Inc.*, No. 1:22-CV-07119, 2023 WL 4865005, at *8 (N.D. Ill. July 31, 2023)(citation omitted). Temu, by controlling the goods at issue, marketed and sold them in commerce.

18.    Temu is not a normal e-commerce platform because it "operates like a mode of end-to-end 'hosting': sellers only handle sourcing of goods, whereas the platform handles pricing, marketing, logistics and after-sales all inclusive." Id. (citation omitted). Indeed, this is no different than how Target or Nordstrom operates their retail stores.

19.    Temu describes itself as a factory maker-seller (industrial zone merchant) that is the source itself of the third-party seller's goods. Id. (citation omitted).

20.    Temu's website at least at one point stated "that it creates and curates products from third-party sellers for the benefit of customers. Id. (citation omitted).

21.    And numerous news articles about Temu describe it "as a full-service marketplace that selects, approves, advertises, prices, stores, and distributes products

from its third-party sellers." Id. (citation omitted).

22.    Temu thus "exercises more control than similar digital marketplaces over the third-party sellers and products sold on its platforms" and at times make sales via "PDD Holding's indirect subsidiaries." Id. at *10.

23.    Plaintiff alleges on information and belief that Temu "tracks production closely, manages inventory efficiently," and provides its vendors with detailed specifications and consumer insights, effectively controlling the entire product conception and manufacture process. Temu's business is based on "its access to a large and trusted network of over 11 million suppliers through PDD[.]" This "backbone" of Temu's business was exposed by Veridion, an intelligence company that builds comprehensive profiles and gains deep insights into digital businesses while delivering high-quality, decision-grade data. Attached as **Exhibit 9** is a copy of its Temu report.

24.    Temu's S.E.C. filings indicate that they face exposure due to their sales of infringing and counterfeit items, and note that a risk to their business model is that "[s]ome of our competitors may be able to secure more favorable terms from merchants," which makes clear that the parties providing goods to Temu – their "merchants" – are not selling directly to consumers without Temu's involvement but actively negotiate with Temu as to the terms related to the Temu goods, a business model consistent with Temu making retail sales.[11]

25.    Temu further concedes that it works with their "merchants streamline their manufacturing and operations, leading to more competitive prices and reduced waste, and" that it uses "fun, interactive shopping experiences and competitive pricing to attract, engage and retain buyers and merchants." Id., pgs. 3, 69.

26.    Temu promotes content and product to its users using trademarks such

---

[11] 2024 SEC Filing Form 20-F,
https://www.sec.gov/Archives/edgar/data/1737806/000141057825000951/pdd-20241231x20f.htm (pg. 19)(last visited December 16, 2205 at 3:09 pm EST)

as the trademarks at issue to do so. Temu pays influencers and others to promote its site and products. And "TEMU [. . . ] compensates users to write reviews," which are then "obviously skewed positive[.]" See **Exhibit 10**, ¶230. On information and belief Temu used Plaintiff's marks to do so.

27.    On information and belief, and as set forth in the reportage for the article entitled "Temu Keeps an Iron Grip on Suppliers, Exposing itself to U.S. Ban Threat," which relies on among other things, interviews with Temu suppliers, a review of their seller agreements, and screenshots,  Temu exerts significant control over the product it sells on its site by, inter alia, micromanaging it suppliers, directing the suppliers as to what products to make and how to price the products, and entirely controlling the shipping, marketing, selling, distributing, and shipping of the product it sells, which would include the products at issue. See **Exhibit 6**, pg. 2.

28.    On information and belief it is alleged that Temu's suppliers' factories ship products in bulk to Temu warehouses in China and the U.S. and Temu "handles marketing and quality checks, packing items into parcels shipped to shoppers and ensuring that the products pass export and import customs clearance." Id., pg. 3.

29.    On information and belief Plaintiff alleges that Temu's profit model is based on Temu "pocketing the difference between the end selling price and the wholesale price it pays suppliers," which is consistent with a normal retail operation and not a "passive online platform." Id.

30.    On information and belief Plaintiff alleges that Temu "uses its own algorithms to determine which products are trending and tells the factories what and how much to produce. All product pricing also must be approved by Temu." Id. pg. 5. For example, if there are significant sales of a particular item, or multiple searches for a key term, such as "Bruce Springsteen," Temu will direct its suppliers to create more of that item, i.e., more Bruce Springsteen merchandise.

31.    Temu also directs the manufacturing process by hosting weekly bidding amongst manufacturers, where Temu specifies a certain product that they want made

and then Sellers who can offer the lowest manufacturing prices for that product have their bid approved by Temu.[12]

32.    In a lawsuit brought against Temu by Shein, its primary competitor, Shein alleged that "Temu masquerades as a legitimate e-commerce "marketplace" where independent sellers can offer their products for sale. But the facts uncovered to date – and those expected to be uncovered in discovery – demonstrate otherwise. Temu is not actually a "marketplace" platform. It controls every aspect of its sellers activity. It directs what products they can list and the prices for which they can sell; encourages them to infringe the intellectual property rights of others; and even prevents them from removing their products from Temu's website after they have admitted to infringement." See **Exhibit 7**.

33.    On information and belief Plaintiff alleges that Temu knew that the numerous suppliers of the infringing products did not have license to use the Subject Marks, and that the disputed products were infringing at the time it offered them for sale, and Temu continued to market and offer for sale goods bearing Plaintiff's trademarks after receiving notice that such goods are infringing.

34.    Indeed, Temu products include "many signals indicating likely counterfeits, such as suspicious pricing and consumer feedback," and Temu "inconsistently intervene[s] to take down these listings. Many suspect listings remain live for extended periods and accumulate substantial sales volumes before removal, suggesting that enforcement systems prioritize complaint-driven interventions over proactive risk mitigation."[13]

35.    Temu removed many if not all of the infringing products at issue solely based upon digital surveillance on counsel viewing the products from his law firm

---

[12] See https://www.greenmatch.co.uk/blog/environmental-impact-of-temu (last visited on December 15, 2025 at 10:26 pm EST).

[13] See https://itif.org/publications/2025/08/20/how-chinese-online-marketplaces-fuel-counterfeits/ (last visited December 17, 2025 at 11:29 am).

1 computer, prior to him providing any notice to Temu. Thus, Temu knew the items
2 were infringing, even before receiving notice from an outside party.

3      36.    Temu sells products supplied by its and PDD's subsidiaries, such as
4 Shanghai Yucan Information Technology and on information and belief the products
5 at issue were provided by Temu and PDD affiliates and subsidiaries. See *Roadget*
6 *Bus. Pte. Ltd. v. PDD Holdings Inc*., No. 1:22-CV-07119, 2023 WL 4865005, at *6
7 (N.D. Ill. July 31, 2023).

8      37.    Temu "commonly generates multiple, sometimes dozens, of separate and
9 independent listings for identical products with differences only in price, shipping,
10 speed, and other minor details." See **Exhibit 10**, ¶243. And its business practice
11 includes "misrepresenting that products offered for sale on the Temu app are authentic
12 and licensed by copyright and trademark holders when those products are not
13 authentic, licensed, or approved by the copyright and trademark holders[.]" Id. at
14 ¶262(c).

15      38.    Plaintiff would likely have obtained additional evidence of Temu's
16 infringement but Temu apparently began surreptitiously tracking Plaintiff's counsel's
17 visits to Temu's site and rapidly deleting evidence that Plaintiff's counsel was
18 viewing before counsel could document any further details.

19      39.    Temu is not a passive marketplace but instead sells products that it
20 sources and for which it directs the manufacture and ships and/or otherwise exercises
21 control. Temu exerts the utmost control of every aspect of its business - including the
22 sourcing, design, manufacturing, pricing,[14] marketing, shipping, sale, customer
23 service, returns and removal of products on its platform. Despite its attempts to shield
24 itself by positioning itself as a marketplace platform, it does not allow supposed
25 "third-party sellers" to decide what products they sell and at what price. Instead, Temu
26
27 _____

[14] *See* https://www.theinformation.com/articles/temu-keeps-an-iron-grip-on-
28 suppliers-exposing-itself-to-u-s-ban-threat

decides what to sell and how to sell. Temu's control over the items sold on its platform, and its involvement in how those items are sold, is so extensive and coercive that its suppliers have protested Temu's business practices, claiming that Temu's heavy handed involvement is preventing them from staying in business.[15]

40.    To protect its dubious claim to be a marketplace platform, Temu often obfuscates and makes it difficult to discern its true relationship with the purported third-party sellers on its website. This is evidenced by a recent government filing in which it was alleged that "Temu's seller identity disclosures have fallen short of the company's obligations under the INFORM Consumers Act. Temu has failed to provide the required disclosures to all consumers, as its disclosures have not been provided on product listings in certain views of the marketplace, including its mobile website and gamified views of the marketplace. Temu also has failed to make its required disclosures in a clear and conspicuous manner." *See* **Exhibit 1**, para 8.

41.    On information and belief it is alleged that Temu conceals the "seller" information because Temu itself is actually the seller and Temu sources the products from the "seller" listed on the product page. As evidence of the foregoing, Temu provided a list of the companies that provided the infringing product to Temu and many of the company information provided was incomplete or dubious, including companies that were identified with no more than garbled letters and "China":



---

[15] *See* https://www.wsj.com/business/retail/temu-suppliers-protest-in-china-saying-low-cost-site-squeezes-them-20cc3cd2

42.    On information and belief, GAS DRAWLS alleges that Temu controls the listings on its platform by choosing the product's pricing and in doing so engaging in a deceptive scheme known as "false reference pricing" in which a listing shows, alongside a full price, a steep discount on an item offered for sale. In reality, the full price is inflated or never accurate to begin with, and the "discounted" price is the actual regular or market price. *See* **Exhibit 2**, para. 196.

43.    On information and belief, GAS DRAWLS alleges that Temu commonly generates multiple separate independent listings for identical products with minor differences in price, shipping speed, and other minor details to create the illusion that the listings are controlled and offered by different sellers. *See id.* at para. 213.

44.    On information and belief, GAS DRAWLS alleges that Temu regularly creates its own advertisements for unlicensed and infringing products, further evincing their knowing misappropriation of the intellectual property of others. *See id.* at para. 217.

45.    On information and belief, Plaintiff alleges that Temu controls the fabrication and distribution of the infringing items it sells on its marketplace, takes title to those items, and/or acts as an agent for its vendors in selling the items. Temu advises the public that it "procures" and "sources" the items it sells on its site, as seen below, and which reflects a standard retail sales model:





46. As further evidence that Temu is the party responsible for selling the infringing products at issue, Temu directs consumers to contact the merchant through Temu's "direct chat function," if there is an issue with the product, as can be seen below, further evidencing Temu's product control:



48.    For some merchants, Temu notes that it is sourcing from that merchant and then provides no actual information relating to said merchant:



49.    On information and belief, Plaintiff alleges that Temu has continued to market and sell products that infringe Plaintiffs' intellectual property rights despite receiving notice of the infringement.

50.    On information and belief, Plaintiff alleges that Temu sells products for which it has title from its own warehouses. As seen below, Temu advertises certain infringing goods as shipping from its "local warehouses," further establishing that

Temu and not its vendors are responsible for selling and shipping the goods:



51.    On information and belief, Plaintiff alleges that Temu is responsible for the shipping and distribution of the goods at issue, as reflected in the packaging in which its products are shipped. As seen below, the packaging states that the goods are being "for Temu" and the address is not one associated with any vendor but is more likely a logistics company that Temu uses to sell the products it sells:



52.    The Subject Marks and GAS DRAWLS' rights in MF DOOM's likeness, signature, name, and photograph have been damaged by Temu's knowing and systematic marketing and sale of counterfeit versions of the brand's trademark of products bearing counterfeit and/or confusingly and/or virtually identical trademarks. Such product devalues the Subject Marks as well as Plaintiff's proprietary and licensed products and MF Doom's status in the hip hop milieu. It also creates a false association between MF Doom and Temu. GAS DRAWLS has been forced to bring these claims against Temu to address the foregoing.

53.    Below are non-exclusive exemplars of authentic GAS DRAWLS product bearing the Subject Marks and infringing counterfeits and knockoffs sold by Temu through the Temu website https://www.temu.com ("Temu Online Store") to, on information and belief, customers in California and beyond:

| GAS DRAWL's Product A | Accused Product A |
|---|---|
|  |  |
| GAS DRAWL's Product B | Accused Product B |
|  |  |

54.    Attached as **Exhibit 8** are additional, non-exclusive exemplars of infringing and/or counterfeit product being offered by Temu on the Temu Online Store. The are not meant to be all-inclusive and the claims made herein are as to all Temu product that bears a counterfeit or confusingly similar copy of one or more of Plaintiff's marks.

55.    GAS DRAWLS discovered these infringing and/or counterfeit products after conducting searches on the Temu Online Store by inputting the term "MF DOOM" in the search bar. On information and belief, GAS DRAWLS alleges that Temu knowingly used and/or offered "MF DOOM" in its metadata and as a search engine keyword that triggered the display of the infringing listing and goods and/or counterfeit goods and induced consumers to buy from Temu and download its app.

56.    Temu thus acted as a retailer and directly sold trademark-infringing items to consumers, even if it "didn't design or manufacture the offending product," though Temu also directed the design and manufacture of the offending product. See *Ohio State Univ. v. Redbubble, Inc*., 989 F.3d 435, 446 (6th Cir. 2021)

57.    Despite notice of the infringement, Temu continued to market and sell product that infringe Plaintiff's trademark rights. For example, Temu continued to offer the below product, which was "procured by Temu," incorporating an infringing mark after receiving notice of this complaint:



58.     During the December 5, 2025 hearing on this case, the Court advised Defendants that if they had any evidence establishing that Temu was a passive platform that did not own or control the merchants, they should provide that to Plaintiff. Defendants produced **nothing**, further establishing that Defendants are actively involved in the creation, marketing, sale, and distribution of the items on its site.

59.     There is no contact information for any of the merchants on the list provided by Temu. The merchants seem to have no online presence, and there is no way to "search by seller" on Temu, so it is all but impossible to ascertain whether the merchants are still active on Temu and there is no way of communicating with them. Thus, Plaintiff was unable to locate online and contact any of the identified vendors, further casting doubt on Temu's claim of passivity.

60.     By way of example, one merchant whose name was supplied by Temu but whose name was marked Attorneys' Eyes Only, is supposedly based in an apartment in a residential complex in Colorado. Based on Plaintiff's investigation, this company has zero online presence, no phone number, no email address, no registration with the Secretary of State, and no business activity. Moreover, based on this same investigation, the individual named as the company's owner has no phone number, email address, or business activity.

61.     Temu's merchant information is highly suspect. Because Temu has marked the merchant list for the products at issue here Attorneys' Eyes Only, we will use a representative seller example to establish that Temu's "passive platform" defense fails. One Temu merchant is identified on Temu's site as Dinhle, Inc., with an address that is in Colorado:



62.     That address is again a residential address and the company has no online presence or business activity. Records indicate that the company was registered in September of 2025 and shares an address with a perhaps defunct restaurant named Tacos El Toro, LLC, both of which supposedly operate out of the below property:



63.    The registered agent for this merchant is Baerjiumr1, Inc:



64.    Tellingly, this same registered agent appears to be the registered agent for *hundreds* of other entities bearing Chinese or non-English names, all of which were registered in Colorado in September 2025, all of which appear to be supposed Temu "merchants," and all of with have random addresses across Colorado:



65.     This orchestrated, concentrated, strategic, and virtually identical effort to register Temu's China-based network of suppliers as Colorado companies cannot be the result of numerous independent merchant efforts and is more likely the result of Temu's systematic efforts to register its suppliers and potentially circumvent state or federal law, which is additional indicia or control and operation.

66.     Plaintiff's investigation is consistent with that of the Information Technology & Innovation Foundation ("ITIF"), which found that nearly half of the Temu items its studied were likely counterfeits. In reaching this conclusion, ITIF attempted to identify the Temu merchants responsible for the products and – time and time again – ran into dead-ends, with the companies apparently operating under aliases and out of residential properties. One Temu merchant, bearing the alias "N502688" operated out of a Colorado address at which seven other apparent e-commerce companies were also registered, all under the same owner.[16]

67.     In accord with this strategy, at least one of the sellers for the products at issue claims to operate out of a residential address in Colorado, but such a claim is likely false and part of Temu's overall fraud.

68.     Plaintiff alleges on information and belief that Defendants own and control these merchants and directed the creation, purchase, sale, distribution, and monetization of the products at issue.

69.     On information and belief Plaintiff alleges that PDD owns, controls, and operates, at least in part, Temu, and many if not all of the merchants that provided the infringing product at issue in this case; for example, PDD owns at least one subsidiary, Shenzen Qianhai Xinzhijiang Information Technology Co. Ltd., located in Guangdong Province, where an overwhelming number of Temu "merchants" have listed their business address:

---

[16] https://itif.org/publications/2025/08/20/how-chinese-online-marketplaces-fuel-counterfeits/ (last visited December 17, 2025 at 11:29 am).

**Store Information**

Business Name
Shenzhenshitaimeishiye Co., Ltd.

Address
Room 509, Building A, Shenzhen Zhihui Innovation Center, Hangcheng Industrial Zone, Taoyuan Community, Xixiang Street, Baoan District, Shenzhen City
Bao'an District
518101
Guangdong Province, Shenzhen
China

The address displayed is the business address. Items with the "Local warehouse" tag may ship from US-based warehouses or fulfillment centers. Some items are shipped from overseas warehouses but will have tracking information for the domestic portion, which is arranged by U.S. warehouses.

Note
If you have any inquiries, you may contact this store through the direct chat function.

70.  In 2024, scores of Temu's Chinese suppliers protested at PDD's office in Guangzhou, underscoring the intertwinement of these entities and further establishing that Temu is not a passive seller of third-party goods. And in December of 2025, just days ago, it was reported that at "least two fistfights occurred at PDD's Shanghai premises involving staff and officials from the State Administration for Market Regulation (SAMR), who were investigating reports of **fraudulent deliveries on the e-commerce firm's platform**, Bloomberg News reported last week."[17] Police arrested "company executives" in connection with a dispute that arose after "[r]egulators had requested to see PDD's transaction data during their inspection, according to a person familiar with the matter. Those figures are highly sensitive as they typically contain extensive proprietary insight into customers and business operations beyond PDD's publicly reported information," according to a source.[18] This is further evidence that Temu is mispresenting and obscuring the true nature of its operations and relationship with suppliers.

---

[17] See https://www.straitstimes.com/business/companies-markets/temu-owner-pdd-fires-dozens-of-workers-after-fistfight-with-china-officials (last visited December 19, 2025 at 12:31 am EST).

[18] See id.

71.    Plaintiff alleges on information and belief that goods from many of the merchants involved in the manufacture of the infringing goods at issue remain for sale on Temu's site and app.

72.    Disputes relating to "any products sold or distributed" through the Temu site are subject to binding arbitration with *Temu* and not the vendor.[19]

73.    PDD and Temu have further exploited and used Plaintiff's Subject Marks and other intellectual property in commerce by exploiting and using said marks and intellectual property to lure consumers to their site and and keep consumers on their site and app in order to access and install malware of consumers phones and computers and exfiltrate the consumers' sensitive personal data and thereafter exploit that data for commercial and business gain.

74.    Plaintiff alleges on information and belief that PDD and Temu accomplished the above by designing its app to (a) allow for extensive data exfiltration from all corners of a user's mobile device; and (b) hide its exfiltration of PII, both from users and any researcher who might be investigating the app's functionality.

75.    Plaintiff alleges on information and belief that Defendants' app also contains multiple portions of code that are recognized by cybersecurity professionals as hallmarks of spyware and malware; code that allows it to reconfigure itself even after having been downloaded to a user's phone, without the user's knowledge or consent; and large swaths of code that had previously been banned from another app marketed by Defendants.

76.    In light of the above, Temu exercises sufficient control over the creation, manufacture, or sale of offending goods to be considered akin to a seller or manufacturer to whom Lanham Act applies.  Indeed, Temu is not a "transactional

---

[19] See https://www.temu.com/terms-of-use.html, paragraph 19 (last visited December 17, 2025 at 2:26 pm EST).

intermediary" between buyers, sellers, manufacturers, and shippers but is instead the party exercising the highest degree of control and involvement over the manufacturing, quality control, and delivery of goods to consumers.

77.    Plaintiff alleges on information and belief that Temu and PDD further exploited Plaintiff's Subject Marks by purchasing the right to use them as keywords and paid search terms for search engines, such as Google. For example, when a consumer searches for Temu products for another hip-hop artist Snoop Dogg, the "Sponsored Products" that appear include Temu products, as can be seen below:



78.    Defendants engaged in the same business practices with Plaintiff's marks. This practice exploited Plaintiff's Subject Marks to lure consumers to Defendant's website and app and induced them to download the app and shop.

79.    Defendants further exploited Plaintiff's trademarks in commerce to induce consumers to download the Temu app and enter into transactions using this Temu app, all of which furthered the scheme described above.

## FIRST CLAIM FOR RELIEF

(For Common Law Trademark Infringement - Against All Defendants, and Each)

80.    The aforementioned paragraphs are incorporated herein as if fully set forth.

81.    Plaintiff and its predecessor have used the mark "MF DOOM" professionally and in connection with his music and merchandise continuously for at least the last twenty years. A prominent feature of music and other merchandise is the repeated use of a name or image that brands the product and identifies the s the viewer.

GAS DRAWLS now owns the relevant marks and goodwill and has created, distributed, and otherwise created and sold physical and online art and merchandise featuring the Subject Marks. Temu's infringement of GAS DRAWLS' intellectual property rights is stark, pervasive, and willful, as reflected in the comparisons of the items lawfully bearing the Subject Marks and the Temu counterfeits, knock-offs, and copies.

82.    GAS DRAWLS owns the Subject Marks and at no time authorized Temu to exploit the Subject Marks in any manner. Despite this lack of consent, Temu marketed, sold, shipped, processed, payment for, and otherwise facilitated transactions involving infringing and counterfeit copies of one or more of the Subject Marks, including without limitation numerous products bearing confusingly similar copies of one or more of the Subject Marks.

83.    Temu exercised control over the advertising, content, and listings on its site as well as advertisements directing consumers to its site and exploited the Subject Marks in doing so.

84.    Temu's unauthorized exploitation of MF DOOM's name and signature aesthetic further violated Plaintiff's trademark and trade dress rights.

85.    Temu exploited the Subject Marks and MF DOOM'S name, as well as the appearance and aesthetic of the products and artwork, to confuse the public and create a false association and sponsorship between Plaintiff, MF DOOM, Temu, and Temu's products. Temu's products bear knowing replicas of the Subject Marks and caused confusion in the marketplace as to sponsorship and association as well as provenance. Temu's marketing and sales of said products violated the Lanham Act.

86.    GAS DRAWLS has continually used the Subject Marks in connection with the advertising, distribution, and sale of its products and music. The Subject Marks have been a staple of hip hop.

87.    GAS DRAWLS markets and sells clothing, records, and merchandise bearing the Subject Marks, and each of them, and operates and maintains a website,

1  https://gasdrawls.com/collections/shop, at markets and sells such product and
2  publishes information about the brand and its products.

3      88.  GAS DRAWLS' uses of the Subject Marks are readily identifiable by
4  consumers and fans and has grown in popularity over the decades. GAS DRAWLS'
5  use of the Subject Marks to brand their clothing and products has been continuous
6  and extensive and resulted in significant goodwill accruing to the Subject Marks. The
7  use of the word "Doom" or "MF DOOM" or the specific graphic image of a mask in
8  the brand's signature style is an indication that the clothing or accessories is associated
9  with GAS DRAWLS and the use of the Subject Marks are a source identifier for the
10  products and art. GAS DRAWLS does not use the mark simply for ornamental
11  purposes, but to identify their art, brand, company, and product. The Subject Marks
12  have been used to brand this art and merchandise for decades and has been used to
13  such a degree that it indicates to the public that GAS DRAWLS is the source of the
14  product which bears the mark.

15      89.  GAS DRAWLS is informed and believes and thereon alleges that Temu
16  markets, advertises, and sells merchandise including prints and apparel some of which
17  is of similar and identical style to GAS DRAWLS' products and is aimed and
18  marketed to the same market and demographic. However, Temu offers its products at
19  a far lower price point and a fraction of the quality.

20      90.  GAS DRAWLS is informed and believes and thereon alleges that after
21  it marketed, advertised, and sold merchandise featuring the Subject Marks, Temu
22  copied the Subject Marks, and/or employed confusingly similar marks, and
23  incorporated same into Temu's products without GAS DRAWLS's consent.

24      91.  GAS DRAWLS is informed and believes that Temu used their products
25  and the Subject Marks for its own marketing because its products are identical or
26  nearly identical to GAS DRAWLS' and are aimed at the same demographic.

27      92.  Temu has used in commerce marks substantially and confusingly similar
28  to the Subject Marks which have reached considerable notoriety and developed

credibility among consumers by selling the infringing counterfeit products and/or offering and using "MF DOOM" as a keyword to find listings selling the infringing counterfeit products. GAS DRAWLS' fonts, styles, and aesthetics as used in connection with the Subject Marks, as evidenced by the product exemplars above have resulted in consumer engagement and notoriety. As evidenced by the comparison of exemplars above, Temu distributed and sold products bearing the Subject Marks or marks confusingly similar. Further, Temu markets and advertises its own brand using the same marketing tactics and aesthetics as employed by GAS DRAWLS for years.

93.    The comparison of the Subject Marks and Temu's infringing and/or counterfeit products' unlawful use of the Subject Marks illustrated above clearly shows the similar nature of the uses and the likelihood it would impact purchasing decisions and confuse the consumer. Temu purposefully acted in a manner that would falsely designate the origin of its use of the Subject Marks on its own products to GAS DRAWLS.

94.    Temu exploited the Subject Marks to lure consumers to its website and to download its app and use both its site and app to make purchases, and as part of that process exfiltrated and purloined valuable material, sensitive user data and PII.

95.    The likelihood of consumer confusion increases when you review the online marketplace, where most shopping and purchasing occurs. GAS DRAWLS is informed and believes and thereon alleges that Temu, before committing the acts alleged herein, was aware of GAS DRAWLS' products, stature in the marketplace, and use of the Subject Marks, and accessed the Subject Marks, via GAS DRAWLS's social media accounts and/or online store and then reproduced and incorporated the Subject Marks into Temu products without GAS DRAWLS' consent.

96.    The product comparisons incorporated herein make it apparent that Temu unlawfully reproduced, copied, used, or otherwise exploited GAS DRAWLS'

products as well as their Subject Marks and have adopted a mark that is substantially and confusingly similar to the Subject Marks.

97.    On information and belief it is alleged that consumers have been confused as to the source of Temu's products and have concluded that GAS DRAWLS is associated with, sponsored, endorsed, or is otherwise affiliated with Temu's products; moreover, consumers have visited Temu's site and/or downloaded its app as a result of this confusion and perceived sponsorship and endorsement.

98.    Plaintiff alleges on information and belief that Temu directed the creation of, procured, bought, marketed, sold, distributed, imported, and shipped the infringing product at issue to consumers in the U.S. and elsewhere.

99.    As a direct and proximate result of Temu's wrongful acts, Plaintiff has been damaged in an amount that is not yet fully ascertainable, but which exceeds the jurisdictional minimum of this court.

100.    Plaintiff is informed and believe and based thereon allege that Temu, in committing the above-described actions, acted willfully, maliciously, and oppressively, and with full knowledge of the adverse effects of their actions on Plaintiff, and with willful and deliberate disregard for the consequences to Plaintiff. By reason thereof, Plaintiff is entitled to recover statutory, punitive, and exemplary damages from Temu, in an amount to be determined at the time of trial.

## SECOND CLAIM FOR RELIEF

(For Trademark Infringement under 15 U.S.C.A. § 1114 - against all Defendants, and Each)

101.    Plaintiff incorporates by this reference all prior paragraphs as if set forth in full in this cause of action.

102.    Per 15 U.S.C. § 1114(a) any person that, without the consent of the trademark registrant, "use[s] in commerce any reproduction, counterfeit, copy... a registered mark in connection with the sale, offering for sale... or advertising of any goods... with which such use is likely to cause confusion, or to cause mistake, or

deceive" consumers shall be liable in a civil action brought by the registrant. Temu's apparel and goods offered for sale contain counterfeits of Plaintiff's trademarks and are likely to cause confusion, mistake or deception on consumers. Per 15 U.S.C. § 1114(1)(b), a party is liable for infringement if they "reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" Defendants have violated both sections.  premised on Google's alleged active creation and publication of infringing Shopping A

103.   As alleged above, Temu counterfeited Plaintiff's registered trademarks by reproducing their protected intellectual property on goods and apparel. Temu then placed these goods and apparel with identical marks for sale on their e-commerce website. Further, Temu used Plaintiff's trademarks on its website and app to lure consumers to its website and download its app and induce consumers to enter into transactions via the website and app while Temu installed malware on their devices and exfiltrated their sensitive personal data and PII, which Temu then further exploited in commerce.

104.   Similarly, and alleged above, Temu exploited Plaintiff's trademarks in the advertising of the counterfeit goods to confuse consumers. Temu intentionally marked and advertised the counterfeited goods under the corresponding mark in order to deceive consumers or cause consumers to confuse or mistake the counterfeited goods with the true and authentic marks.

105.   Temu used in commerce counterfeit or copied registered marks in connection with the sale of goods that is likely to cause confusion without the consent or authorization of Plaintiff, including by using and offering for use keywords such as "MF DOOM" that would lead customers to the listings offering for sale the

infringing and counterfeit products. Temu's conduct violates 15 U.S.C.A. Section 1114.

106.   On information and belief, Temu's use of the trademarks in connection with the sale of goods was done with the knowledge and intent to cause confusion, mistake, or to deceive consumers.

107.   Plaintiff has sustained significant injury and monetary damages as a result of Temu's wrongful acts as alleged above. Plaintiff is at present unable to ascertain the full extent of the monetary damages they have suffered by reason of said acts.

108.   Defendants further violated Section 1114(1)(b) by knowingly and actively creating and publishing to the public on its site and app the listings for the infringing items and advertisements reflecting the infringing items, both of which unlawfully include the Subject Marks.

109.   15 U.S.C.A. Section 1117 provides recovery for the violation of rights of the registrant of a mark registered with the Patent and Trademark Office. Section 1117(a) provides remedies for willful violations, including recovery of (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. Subsection (b)(1) provides for treble damages if the violation consists of "intentional use of the mark, knowing such mark or designation is counterfeit mark... in connection with the sale, offering for sale..." Additionally, subsection (c) provides a remedy for statutory damages in connection to the sale of counterfeit marks in the amount of (1) "not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale... as the court considers just; or (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just."

110.   Temu's use of the counterfeit marks was willful, and with the knowledge and intent to confuse, mistake and/or deceive consumers into purchasing the knock-off goods.

111.   Plaintiff has been injured and will continue to suffer injury because of Temu's violations of 17 U.S.C.A. Section 1114 and is entitled to Temu's profits, treble, and statutory damages.

## THIRD CLAIM FOR RELIEF

(For Unfair Competition under Section 43(a) of the Lanham Act, False Endorsement (15 U.S.C. § 1125(a)) - against all Defendants, and Each)

112.   Plaintiff repeats, realleges, and incorporates herein by reference as though fully set forth, the allegations contained in the preceding paragraphs of this Complaint.

113.   Plaintiff's personality, signature, and name have secondary meaning, as that term is understood in trademark law. Further, Plaintiff has registered trademarks with the United States Patent and Trademark Office. As described above, Temu has falsely used artwork reflecting Plaintiff's name and signature on apparel, prints, and other products, creating the false impression that the Plaintiff endorses Temu. Members of the public have come to recognize the Plaintiff's signatures, trademarks, and name as suggestive of the Plaintiff's involvement or endorsement when they are used in commerce. Temu made a calculated and underhanded effort to promote their products and attract customers using the goodwill and recognition that many have come to associate with Plaintiff's name, signature, and registered trademarks, thereby generating revenue for Temu.

114.   Temu has used the Subject Marks on or in connection with goods that it has offered to sell, sold, shipped, and delivered to the public, thus employing words and symbols to both falsely designate the origin of the goods, but also to falsely and misleadingly represent to the public that Temu and MF Doom are associated, or that

MF Doom sponsored or approved of the infringing items, or that the infringing items originated from MF Doom.

115.    Temu's misrepresentations in its commercial advertising and promotion, misrepresents the nature, characteristics, qualities, and origins of the infringing items at issue, none of which originate from or were approved by Plaintiff.

116.    On information and belief it is alleged that Temu willfully sought to trade off of and benefit from Plaintiff's brand awareness and goodwill to sell products and lure consumers to download and use its proprietary app and drive traffic to its app and webstore.

117.    The goodwill and reputation associated with Plaintiff's name, signature, and registered trademark are significant throughout the general public. The Plaintiff's name, signature, and registered trademarks are known throughout the United States, the State of California, and the world, as a source of origin for their products, services and endorsements.

118.    Temu's use of the Plaintiff's name, signature, and registered trademarks are designed to create and do create the false and deceptive commercial impression that Temu and their products are associated with and/or endorsed by the Plaintiff. The use by Temu of the Plaintiff's name, signature, artwork, and registered trademarks is likely to cause confusion, mistake, or deception of purchasers as to the Plaintiff's endorsement of the goods and Temu's website and app.

119.    On information and belief, it is alleged that Temu is offering to sell, selling, and marketing products bearing counterfeit marks, knowing one or more of the marks was registered, with the counterfeit marks being identical with, or substantially indistinguishable from, Plaintiff's marks.

120.    Customers and potential purchasers are likely to be attracted to Temu's goods, site, and app as a result of the misconduct described herein. Such goods, site,

and app enjoy an elevated standing as a result of a false association with the Plaintiff.

121.   By Temu's conduct alleged here, Temu have wrongfully appropriated for itself business and goodwill value that properly belongs to the Plaintiff and that the Plaintiff has invested time, money, and energy in developing.

122.   By reason of Temu's acts of unfair competition as alleged herein, the Plaintiff has suffered and will continue to suffer substantial damages to their businesses in the form of diversion of trade, loss of profits, and a dilution in the value of their rights and reputation, all in amounts which are not yet ascertainable but which are estimated to be not less than the jurisdictional minimum of this court.

123.   By virtue of Temu's acts hereinabove described, Temu has committed, and are continuing to commit, unlawful, unfair, and fraudulent business acts in violation of, inter alia, 15 U.S.C. § 1125(a).

124.   Given Temu's sale, offering for sale, and/or distribution of counterfeit goods, it is liable for treble damages, attorneys' fees, and statutory damages of up to $2,000,000.00 per counterfeit mark per type of goods sold, offered for sale, or distributed, as the court considers just.

125.   Temu's acts of unfair competition in violation of 15 U.S.C. § 1125(a) have caused, and will continue to cause, damage and irreparable harm to the Plaintiff (as described above) and is likely to continue unabated, thereby causing further damage and irreparable harm to the Plaintiff, and to the goodwill associated with the Plaintiff's valuable and well-known name, signature, artwork, and registered trademarks; and the Plaintiff's business relationships, unless preliminarily and permanently enjoined and restrained by the Court.

126.   The Plaintiff has no adequate remedy at law and will suffer irreparable injury if Temu is allowed to continue to engage in the wrongful conduct herein described.

127.   In committing these acts of unfair competition, Temu acted willfully, wantonly, and recklessly; and with conscious disregard for the Plaintiff's rights. The Plaintiff is therefore entitled to actual and statutory damages as allowed by law.

### FOURTH CLAIM FOR RELIEF

(For Unfair Competition under California Business and Professions Code §§ 17200, et seq.- against all Defendants, and Each)

128.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

129.   Temu, by means of the conduct described above, have engaged in, and are engaging in, unlawful, unfair, fraudulent and deceptive business practices under California Business and Professions Code §§ 17200 through 17203. These acts and practices undertaken by Temu violate California Business & Professions Code § 17200 in that they are—as described above—unfair, fraudulent, and/or unlawful. Specifically, without limiting the generality of the foregoing, such acts and practices constitute violations of the Lanham Act, and are and were fraudulent in that: (a) Temu seeks to deceive consumers regarding Temu's association with Plaintiff, and (b) the general public and trade is likely to be confused regarding the business relationship between the Plaintiff and Temu. Further, without limiting the generality of the foregoing, the harm to the Plaintiff and to members of the general public far outweighs the utility of Temu's practices and, consequently, Temu's practices constitute an unfair business act or practice within the meaning of Business and Professions Code § 17200.

130.   The Plaintiff has sustained, and will continue to sustain, serious and irreparable injury to their businesses and reputation, as a direct and proximate result of Temu's conduct (as described above). Unless Temu is enjoined by this Court, there is a substantial possibility that they will continue to engage in such unlawful, unfair, and deceptive business practices, for which the Plaintiff is without an adequate remedy at law. Accordingly, the Plaintiff is entitled to a preliminary injunction and

permanent injunction against Temu and its officers, directors, employees, agents, representatives, affiliates, subsidiaries, distributors, and all persons acting in concert with them, prohibiting them from engaging in further unlawful, unfair and/or fraudulent business practices.

131.   As a direct result of Temu's unlawful, unfair, fraudulent, and deceptive business practices, Temu has received, and continue to receive, income and profits that they would not have earned but for their unlawful, unfair, and deceptive conduct and the Plaintiff is entitled to disgorgement of such funds wrongfully obtained.

132.   By reason of Temu's acts of unfair competition as alleged herein, the Plaintiff has suffered and will continue to suffer substantial damage to their businesses in the form of loss of profits, and a dilution in the value of their rights and reputations, all in amounts which are not yet ascertainable but which are estimated to be not less than the jurisdictional minimum of this court.

133.   The Plaintiff is also entitled under the provisions of Business and Professions Code §17208 to an injunction prohibiting Defendants, and each of them, from engaging in any act, directly or indirectly, which constitute unlawful, unfair, and deceptive business practices.

134.   In committing these acts of unfair competition, Temu acted willfully, wantonly, and recklessly; and with conscious disregard for the Plaintiff's rights. The Plaintiff is therefore entitled to actual and statutory damages as allowed by law.

135.   Temu's conduct, if allowed to proceed and continue and/or let stand, will cause irreparable damage to the Plaintiff's valuable business relationships and consumer relations and will require the Plaintiff to undertake efforts to mitigate damage to such relations, all to the Plaintiff's detriment.  Further, such mitigation costs will require substantial time, effort, and expenditures by the Plaintiff, all to the Plaintiff's detriment.

# **FIFTH CLAIM FOR RELIEF**

(For Unfair Competition under California Common Law- against all Defendants, and Each)

136.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

137.   Plaintiff alleges on information and belief that any association or implied relationship or sponsorship between MF DOOM, Plaintiff's marks, and the Temu marketplace constitutes unfair competition at it will tarnish and devalue Plaintiff's marks because not only is Temu subject to allegations of egregious and horrific business practices, but it regularly stocks, markets, and sells products that shock the conscious, including without limitation those set forth below, which reflect Temu's conduct and complicity in directly marketing and selling product endorsing homophobia, inciting violence, and violent criminal gang activity:

## **Temu Product Exemplars:**



138.   The Temu conduct described above as well as in all preceding paragraphs of this Complaint constitutes unfair competition under the common law of the State of California. As a result of Temu's actions, the Plaintiff has been damaged in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

(For Contributory Trademarking Counterfeiting and Infringement - against all Defendants, Each)

139.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

140.   Plaintiff alleges on information and believe that Defendants, and each of them, or affiliated or related companies owned at least in part by PDD or other Temu affiliates, sold, shipped, and supplied the infringing goods at issue to Temu.

141.   Plaintiff alleges on information and belief that Temu used the goods provided by Temu or affiliated or related companies owned at least in part by PDD or other Temu affiliates other Defendants or affiliates to infringe the Paintiff's trademark.

142.   Plaintiff alleges on information and belief that Defendants knew or had reason to know that Temu and its merchants would use the goods to infringe Plaintiff's trademark.

143.   On information and belief Plaintiff alleges that Temu knew that it and its merchants were infringing Plaintiff's trademark yet continued to supply its services and market and sell the products at issue.

144.   Temu, at the very least, supplied the necessary marketplace for the sale in substantial quantities of the infringing items at issue, and provided the website, URL, app, advertising, listings, and customers for said infringing items.

145.   Temu knew, or had reason to know, or was willfully blind to the fact that its app and site are rife with counterfeits, including the substantial number of counterfeits at issue in this case, as reflected in **Exhibit 8** and elsewhere herein.

146.   Temu exercised direct control over, and monitoring of, the instrumentality used to sell the infringing items, namely its website and app. Temu also exercised direct control over, and monitoring of, the warehousing, shipping, importing, and sale of the infringing items.

147.   With notice, actual, constructive or otherwise, of the infringement, Temu continued to market and sell the counterfeits at issue via its website and app and to use the Subject Marks to induce consumers to download and use its app and visit its webstore.

148.   Temu is thus responsible for the torts of the merchants it permitted to sell the infringing items on its site while knowing or having reason to know that one or more of said merchants was acting or would be acting tortiously.

149.   Thus, even if Temu may not have had a duty to police its marketplace, it was at the very least willfully blind to the violations, or had actual knowledge of them. See *Coach, Inc. v. Swap Shop, Inc.*, 916 F. Supp. 2d 1271, 1279 (S.D. Fla. 2012).

150.   Temus is thus contributorily liable for this product and the counterfeiting and infringement resultant from its use in commerce.

151.   Plaintiff was damaged by the infringement, which was willful, wanton, malicious, and oppressive, and seeks general, special, and punitive damages in an amount to be set at trial.

## SEVENTH CLAIM FOR RELIEF

(For Inducing Trademark Infringement and Counterfeiting - against all Defendants, Each)

152.   Plaintiff incorporates by this reference all paragraphs of this Complaint as if set forth in full in this cause of action.

153.   Defendants are liable for trademark infringement by its vendors because they intentionally induced those vendors to infringe the Subject Marks by

directing them as to what to manufacture and overseeing the manufacturing process as well as by pricing, shipping, and exercising control over those products.

154.    Temu and its vendors infringed the plaintiff's trademarks by marketing, selling, and shipping the above-mentioned product at issue to consumers.

155.    Defendants intentionally induced their vendors to infringe Plaintiff's trademarks by advising them as to what to make, what is likely to be successful on the Temu app and site, and to include certain intellectual property.

156.    Plaintiff was damaged by the infringement, which was willful, wanton, malicious, and oppressive, and seeks general, special, and punitive damages in an amount to be set at trial.

## EIGHTH CLAIM FOR RELIEF

(For Vicarious Trademark Infringement and Counterfeiting - against all Defendants, Each)

157.    Plaintiff incorporates by this reference the above paragraphs as if set forth in full herein.

158.    Defendants and the parties that supplied or provided the infringing product at issue have an apparent or actual partnership, as evidenced by Temu's relationship with its vendors and the marketing and sale of the products at issue on Temu's website and the warehousing, shipping, importation, and delivery of the infringing product

159.    Temu has the authority to bind the merchants that provided the infringing product at issue in transactions with third parties, including those that purchase products via Temu's website and app. It may bind them to sales contracts for the items sold via Temu's website and app and to delivery and logistics contracts.

160.    Temu and its vendors exercise at least joint ownership or control over the infringing product, including its creation, shipping, stocking, pricing, warehousing, distribution, importation, and quality control.

161.    Temu's representations to consumers about the products on its site and app, which are marketed primarily under Temu's name, supplies a reasonable basis for buyers of products from its site and app to believe that Temu is selling the product and that the suppliers authorized Temu to market and sell the infringing product.

162.    Temu and its suppliers have an actual or apparent partnership though which they market, sell, and ship goods via Temu's site; Temu has the authority to bind the suppliers in sales transactions with consumers; and Temu and its suppliers exercise at a minimum joint ownership or control over the infringing product and its specifications, quality, pricing, stocking, and distribution.

163.    Temu is thus vicariously liable for this product and the counterfeiting and infringement resultant from its use in commerce.

164.    Plaintiff was damaged by the infringement, which was willful, wanton, malicious, and oppressive, and seeks general, special, and punitive damages in an amount to be set at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as follows:

1.    That Plaintiff is awarded all damages, including actual, statutory, punitive, and future damages that are due to the acts complained of herein, subject to proof at trial;

2.    That Plaintiff is awarded its costs and expenses in this action;

3.    That Plaintiff is awarded its attorneys' fees;

4.    For an order permanently enjoining Defendants and their employees, agents, servants, attorneys, representatives, successors, and assigns, and all persons in active concert or participation with any of them, from engaging in the misconduct referenced herein;

5.     That Defendants be ordered to immediately recall and remove all subject advertisements from all remaining locations, physical or digital;

6.     That Defendants be ordered to file with this Court and serve upon Plaintiff's counsel within thirty (30) days after services of the judgment demanded herein, a written report submitted under oath setting forth in detail the manner in which they have complied with the judgment;

7.     For disgorgement of all proceeds, and restitution of the monies wrongfully received by Defendants as the result of their wrongful conduct, and for the entry of a constructive trust over all such proceeds to be then tendered to Plaintiff;

8.     That Plaintiff be awarded statutory, actual, treble, and exemplary damages, including without limitation as available under the Lanham Act, and 15 U.S.C.A. § 1114;

9.     That Plaintiff is awarded punitive damages in an amount sufficient to deter Defendants from their wrongful conduct; and

10.    For further relief, as the Court may deem appropriate.

Plaintiff demands a jury trial on all issues so triable pursuant to Fed. R. Civ. P. 38 and the 7th Amendment to the United States Constitution.

Respectfully submitted,

Dated: December 19, 2025          By:     */s/ Scott Alan Burroughs*
                                          Scott Alan Burroughs, Esq.
                                          Andres Navarro, Esq.
                                          DONIGER / BURROUGHS
                                          Attorneys for Plaintiff

                                  By:     */s/ Jeff S. Gluck*
                                          Jeffrey S. Gluck, Esq.
                                          GLUCK LAW FIRM
                                          Attorneys for Plaintiff